UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NASTO BOGOJEVSKI,

      Plaintiff

v.

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

_____/

Civil Action No. 15-13760

HON. ROBERT H. CLELAND
U.S. District Judge
HON. R.  STEVEN WHALEN
U.S. Magistrate Judge

## **REPORT AND RECOMMENDATION**

Plaintiff Nasto Bogojevski ("Plaintiff") brings this action pursuant to 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner denying his application for Disability Insurance Benefits ("DIB") and Supplement Security Income ("SSI") under the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below, I recommend that Defendant's motion for summary judgment [Dock. #16] be GRANTED and that Plaintiff's motion for summary judgment [Dock. #10] be DENIED.

-1-

# I.  PROCEDURAL HISTORY

On June 12, 2009, Plaintiff filed applications for DIB and SSI, alleging disability as of January 5, 2009 (Tr. 247, 252).  After the initial denial of the claim, Plaintiff requested an administrative hearing, held on January 12, 2011 before Administrative Law Judge ("ALJ") Jerome Blum (Tr. 70-96).  On March 22, 2011, ALJ Blum found Plaintiff not disabled (Tr. 99-117).  On October 31, 2011, the Appeals council remanded the case, finding, in effect, that (1) the ALJ failed to consider Plaintiff's severe mental and physical impairments in finding that he was capable of a significant range of work, and (2) the ALJ's did not support his finding that the treating source opinions were not entitled to any weight  (Tr. 120-121).

On May 1, 2012, ALJ Blum held a second hearing (Tr. 51-69) and on March 25, 2012, again found that Plaintiff was not disabled (Tr. 127-139).  On September 24, 2013, the Appeals Council again remanded the case for further fact-finding, this time on the basis that (1) the ALJ did not make "an adequate evaluation" of an examining source opinion, (2) the ALJ failed to consider the condition of Chronic Obstructive Pulmonary Disease ("COPD") in finding that Plaintiff could perform exertionally medium work, (3) the treating and non-treating source opinions required "further consideration," (4) "additional evidence" consisting of medical evaluations,  Plaintiff's description of his limitations, and further evaluation of the mental and physical impairments was required, and (5) "if warranted by the expanded record" the ALJ was required to take additional vocational testimony (Tr. 145-146). The Appeals Council assigned the case to a different ALJ (Tr. 147).

On February 26, 2014, ALJ Timothy Christensen presided at a second rehearing in Oak Park, Michigan  (Tr. 13).  Plaintiff, represented by attorney Mark Greenman, testified (Tr. 16-25), as did  Vocational Expert ("VE") Scott Silver (Tr. 25-27).  On April 10, 2014, ALJ Christensen found that Plaintiff was not disabled  (Tr. 32-45).  On September 18, 2015, the Appeals Council denied review (Tr. 1-6).  Plaintiff filed for judicial review of the final decision on October 26, 2015.

## II.  BACKGROUND FACTS

Plaintiff, born February 29, 1964, was 50 when ALJ Christensen issued his decision (Tr. 45, 247).  He completed 12th grade and worked as an auto mechanic (Tr. 297, 300).   He alleges disability resulting from depression, paranoia, hypertension, respiratory problems, and panic attacks (Tr. 296).

### A.       Plaintiff's Testimony (February 26, 2014)[1]

Plaintiff offered the following testimony:

He was three days short of his 50th birthday (Tr. 16).  He emigrated from Yugoslavia as a child, and as an adult worked in an auto salvage business with his father (Tr. 17).  He had not worked since 2000 (Tr. 17).  *Plaintiff's attorney interjected that the application for disability was mostly based on mental impairments, but also included "some" COPD, and*

---

[1]

Because ALJ Christensen's April 10, 2014 decision was based on testimony taken at the February 26, 2014 hearing, Plaintiff's testimony at the two earlier hearings is omitted from discussion.

-3-

*vertigo* (Tr. 17).  Plaintiff's mental health issues began when his mother died in 2008 (Tr. 18).   He currently lived alone in his father's house (Tr. 18).  Either his brother, sister, or sister-in-law visited him on a daily basis (Tr. 19).  Plaintiff did not cook and relied on his sister or sister-in-law to bring him food, or he assembled simple meals (Tr. 19).  He did not leave the house by himself and had not driven in the past six months (Tr. 19-20).  He relied on family members to do his laundry (Tr. 20).  He spent most of each day sleeping (Tr. 20).  He did not have a typical sleep schedule and slept either on a couch or in bed (Tr. 21).  His family had to remind him to take showers and change clothes (Tr. 21).  He customarily wore sweat pants and a t-shirt or long sweater (Tr. 21).  He did not bother to change clothes when retiring for the night (Tr. 21).  He did not have a computer (Tr. 22).  He was able to read but did not read as a pastime (Tr. 22).  He seldom watched television (Tr. 22).

Plaintiff was currently attending group therapy sessions, but was not sure whether they were helpful (Tr. 22-23).  Psychotropic medication had caused weight fluctuations of up to 80 pounds (Tr. 23).  Due to mood swings, he sometimes neglected to eat for up to two days (Tr. 23).  He did not participate in either summer or winter outdoor activities, but during the summer occasionally went into the back yard of his home for fresh air (Tr. 23-24).  His family members had to remind him to take his medication but he did not experience the medication side effects of tiredness or dizziness (Tr. 24-25).

-4-

**B.      Medical Evidence**

**1.  Records Related to Plaintiff's Treatment**

June, 2008 records show that Plaintiff was hospitalized for five days for acute cellulitis of the left leg (Tr. 376-377).   Treating records note that Plaintiff was "well appearing" and "in no acute distress" with clear lungs (Tr. 378).  In addition to cellulitis, he was diagnosed with obesity and "athletic foot" (Tr. 381).   In March, 2009, blood tests showed a fasting glucose level of 109 (Tr. 413).   An EKG was unremarkable (Tr. 415).

In May, 2009, spirometry testing was normal (Tr. 442).  The same month, blood tests showed a Vitamin D deficiency (Tr. 441).   Treating records by Ali Fadel, M.D. note Plaintiff's report of depression and fatigue (Tr. 434).   In June, 2009, Deebajah Ihab, M.D. noted Plaintiff's report of sleep disturbances due to "cough and choking" (Tr. 420).   Plaintiff reported that he typically retired between 12:00 and 1:00 a.m. and arose at 8:30 (Tr. 420). He reported "problems at work or with family due to excessive daytime sleepiness" (Tr. 420). Plaintiff stated that he typically worked "9:00 a.m. to 5:30 p.m." doing "machinery" work (Tr. 420).   Dr. Ihab noted normal muscle strength and tone and observed that Plaintiff was fully oriented with a normal mood and affect (Tr. 421, 437).   He noted the absence of respiratory problems (Tr. 437).   A sleep apnea study scheduled for the same month was deferred due to lack of insurance coverage (Tr. 426).   Dr. Fadel's records from the same month note Plaintiff's report of back pain for the last three months (Tr. 430).   Dr. Fadel's October, 2009 records note Plaintiff's complaint of sleep disruptions and liver pain (Tr. 481).

-5-

The records contain the statement "totally disabled" (Tr. 481).

A November, 2011 ultrasound of the abdomen and kidneys showed a small cyst on the left kidney and fatty infiltration of the liver but no other abnormalities (Tr. 520). December, 2011 treating records note that results of a prostate examination were benign (Tr. 522). February, 2012 records note Plaintiff's report that he was still depressed but denied suicidal ideation (Tr. 523). In April, 2012, he reported an improvement in depressive symptoms (Tr. 524).

Psychological intake records from the same month state that Plaintiff reported constant depression and that his depression worsened after his mother's 2008 death (Tr. 525). The intake records note "very poor eye contact, sluggish demeanor and slow speech (Tr. 525). Plaintiff expressed reservations about taking psychotropic medicine (Tr. 525). He reported feeling dizzy, fatigued, guilty, hopeless, lonely, and sleep deprived "quite a bit" (Tr. 530-531). The same month, therapist Dr. Haitham Safo diagnosed Plaintiff with major depression, assigning him a GAF of 50[2] (Tr. 534).

January, 2013 records state that Plaintiff continued to experience "non-suicidal" depression (Tr. 536). October, 2013 records state that Plaintiff currently took Naproxen, Antivert, and Celexa (Tr. 540). Psychological intake records by Macomb County

---

[2]A Global Assessment of Functioning ("GAF") of 41 to 50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* ("*DSM-IV-TR*"), 34 (4th ed.2000).

Community Mental Health from the following month note Plaintiff's report of isolation and lack of motivation (Tr. 552). Plaintiff denied homicidal or suicidal ideation, stating that he felt "'okay'" on his current medication, but believed "it could be a little better" (Tr. 552). He displayed normal abilities in communication, perception, judgment, and thought processes with an "apathetic" mood (Tr. 553). He was assigned a GAF of 48 due to depression with isolation, lack of motivation, increased sleep, and "variable appetite" (Tr. 561). Therapy notes from the same month state that Plaintiff appeared depressed but was fully oriented with "appropriate hygiene and grooming" (Tr. 464). Therapy records from the following month note that Plaintiff denied "sleeping or appetite disturbances" (Tr. 567). Plaintiff displayed appropriate "thought and speech patterns" (Tr. 567).

January, 2014 group therapy notes state that Plaintiff participated appropriately (Tr. 568). Individual therapy records state that Plaintiff was fully oriented with good hygiene and grooming (Tr. 569).

### 2. Consultative and Non-Examining Sources

In September, 2009, F. Qadir, M.D. performed a consultative psychiatric examination on behalf of the SSA, noting Plaintiff's report of depression since his mother's December, 2008 death (Tr. 444). Plaintiff reported that he slept excessively and required reminders to shower (Tr. 444). He reported that his sisters did the household chores (Tr. 444-445).

Dr. Qadir observed "average self-esteem," "no motivation," and "psychomotor retardation" (Tr. 445). Dr. Qadir found that Plaintiff did not exaggerate his symptoms (Tr.

445).  He concluded that Plaintiff experienced depression "with psychosis," assigning him a GAF of 46 (Tr. 445).  He found that Plaintiff was capable of handling his own benefit funds (Tr. 446).

In October, 2009, Zara Khademian, M.D. performed a non-examining Mental Residual Functional Capacity Assessment on behalf of the SSA, finding that Plaintiff experienced moderate limitation in the ability to maintain attention for extended periods, perform work-related activities within a schedule, complete a workday without psychologically based interruptions, and respond appropriately to criticism from supervisors (Tr. 456).  Dr. Khademian cited consultative examination findings of "normal gait, good hygiene, average self esteem, good contact with reality, [and]good memory, concentration and calculation," concluding that Plaintiff could perform "sustained simple work activity" (Tr. 458, 476).  Dr. Khademian also completed a Psychiatric Review Technique, finding that due to "major depression with psychosis," Plaintiff experienced moderate limitation in daily living, social functioning, and concentration, persistence, or pace (Tr. 465, 470).  Dr. Khademian cited the consultative records stating that Plaintiff became depressed after his mother died in 2008 (Tr. 472).  Dr. Khademian also cited treating records showing a positive response to psychotropic medication, noting that Plaintiff's alleged limitations were mostly attributable "to his multiple medical condition[s] including sleep apnea. . . ."  (Tr. 478).

In February, 2011, psychiatrist Atul Shah, M.D. performed a consultative examination, noting Plaintiff's report that he experienced depression after his mother died

(Tr. 483).  Plaintiff reported that he had "no motivation" and was "isolative," "aloof," and tired (Tr. 483).  He denied hallucinations but felt that others were watching him (Tr. 483). He reported that he had not worked since his mother died (Tr. 484-485).  He stated that he watched television and was able to take care of daily chores without help (Tr. 484).

Dr. Shah noted that Plaintiff no longer took Zoloft due to the lack of insurance coverage (Tr. 483).  Dr. Shah concluded that depression interfered with Plaintiff's "ability to interact with the public, coworkers, and family members" (Tr. 485).  He assigned Plaintiff a GAF of 60,[3] noting that Plaintiff was "subject to relapses in view of the lack of psychiatric intervention" (Tr. 485).  Dr. Shah also assessed Plaintiff's work-related abilities, finding that he experienced moderate limitation in making simple judgments, understanding, remembering, or carrying out complex instructions, and making complex judgments (Tr. 486).  He also found moderate limitations in the ability to interact appropriately with supervisors and coworkers and respond appropriately to workplace changes (Tr. 487).

The same month, Julia Czarnecki, M.A. (under the guidance of psychologist Nick Boneff Ph.D.) performed a mental status examination, noting Plaintiff's report that he quit work because he "couldn't stay focused" (Tr. 492).  Plaintiff denied psychotic symptoms, paranoia, delusions, and sleep and appetite problems (Tr. 493).  Czarnecki observed a normal gait and clear speech (Tr. 493).  She opined that Plaintiff exaggerated his cognitive and

---

[3]A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. *DSM-IV-TR* at 34.

psychiatric symptoms and "put forth minimal effort" in completing the intelligence testing (Tr. 493). She found that he was "somewhat uncooperative and unmotivated and defensive" and "seemed to exaggerate his symptoms" (Tr. 493). She found that Plaintiff had a full scale IQ of 71 but noted that the scores were "at least a slight under-estimate" of Plaintiff's potential "due to . . . lack of motivation, interest and poor cooperation throughout the testing" (Tr. 495). Czarnecki noted that "[h]e is likely capable of functioning closer to a consistently low average range of intelligence" based on his academic and work history (Tr. 495). She assigned a GAF of 60 with a "fair" prognosis (Tr. 495). She found that he was capable of managing his own benefit funds (Tr. 495). She found that Plaintiff did not experience significant psychological limitation (Tr. 497-498).

The same month, Ernesto Bedia, M.D. performed a physical consultative examination on behalf of the SSA, noting Plaintiff's denial of respiratory problems during his waking hours (Tr. 502). He noted a diagnosis of hypertension and "snoring by history" (Tr. 503-504). Dr. Bedia found that Plaintiff's "blood pressure [was] acceptable without any medication" (Tr. 504). A physical examination was unremarkable (Tr. 503). Dr. Bedia found that Plaintiff did not experience significant exertional, postural, manipulative, or environmental limitations (Tr. 509-513). Range of motion and other functional studies were also unremarkable (Tr. 515-518).

### 3.  Evidence Submitted After the ALJ's April 10, 2014 Decision (Tr. 571-575)[4]

March, 2014 therapy records note Plaintiff's report of "low mood, energy, poor memory concentration" and isolation (Tr. 571).  He presented with a depressed mood and constricted affect (Tr. 572).  His appetite, sleep, impulse control, and judgment were unremarkable (Tr. 573).

### C.  Vocational Expert Testimony (February 26, 2014)

VE Scott Silver classified Plaintiff's former work as a wrecking mechanic as exertionally heavy and semiskilled[5] (Tr. 25). VE Silver found that the position did not have transferrable skills to other occupations (Tr. 25).  The ALJ then described a hypothetical individual of Plaintiff's age, education, and work history:

> This individual does not have any exertional limitations but would be limited
> to simple routine tasks with occasional changes in the work setting and only

---

[4]

Under the sixth sentence of 42 U.S.C. § 406(g), records submitted after the administrative decision are subject to a narrow review by the reviewing court. *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). To establish grounds for a "Sentence Six" remand, the claimant must show that the "new evidence is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding ..." § 405(g).

Plaintiff does not cite the newer evidence, much less argue that it provides a basis for remand.  My own review of these records shows that it would not change the ALJ's findings, even assuming Plaintiff could provide "good cause" for its tardy submission.

[5]20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools;  *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;"  *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work " lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

brief and superficial contact with others.  Would there be any work for that individual? (Tr. 25-26).

The VE stated that the above limitations would allow for the exertionally medium work of a cleaner (commercial institutional) (7,300 jobs in the State of Michigan) and laborer (4,000); the light work of a small products assembler (3,000); and the sedentary work of a surveillance monitor (2,500) (Tr. 26).

The VE found that if the same individual were required to avoid concentrated exposure to respiratory irritants, temperature and humidity extremes, and hazards, the cleaner position would be eliminated (Tr. 26).  The VE found that if the same individual were also limited by "the need to isolate, lack of motivation, inability to maintain concentration and an inability to interact with others on a sustained basis" causing him to be off task at least 20 percent of the workday, all competitive employment would be precluded (Tr. 27).

### D.  The ALJ's Decision

Citing the medical transcript, ALJ Christensen found that Plaintiff experienced the severe impairment of depression but that the condition did not meet or medically equal an impairment found in Part 404 Appendix 1 Subpart P, Appendix No. 1 (Tr. 35-37).  He found that none of the physical impairments were severe, citing an unremarkable December, 2011 examination (Tr. 35).  The ALJ determined that Plaintiff experienced moderate limitation in activities of daily living, social functioning, and concentration, persistence, or pace (Tr. 37-38).  The ALJ found that Plaintiff retained the Residual Functional Capacity ("RFC") for a full range of work with the following limitations:

-12-

[C]laimant is restricted to unskilled jobs . . . with specific vocational preparations levels of one or two with simple, routine tasks.  The claimant also is limited to occasional changes in the work setting and brief contact with others (Tr. 39).

Citing the VE's testimony, the ALJ found that while Plaintiff was unable to perform any of his past relevant work, he could perform the jobs of cleaner, laborer, small products assembler, and cleaner[6] (Tr. 36-37).

The ALJ discounted Plaintiff allegations of disability, citing essential normal physical examinations in September, 2009, February, 2011, and December, 2011 (Tr. 35).  He noted that  sleep apnea had been "ruled out" at a September, 2009 consultative examination and that a February, 2011 pulmonary function test was "unremarkable" (Tr. 36).  Contrary to the hearing testimony, the ALJ observed that in February, 2011, Plaintiff told a consultive examiner that he was capable of taking care of "daily chores" (Tr. 37).  Despite Plaintiff's testimony that he required reminders to perform self-care tasks, the ALJ noted that "the overwhelming majority of the medical reports" show that Plaintiff had "good grooming and hygiene" (Tr. 37).

---

[6]

The final occupational finding of "cleaner" deviates from the VE's finding of surveillance system monitor (*compare* Tr. 26, 45).  However, the ALJ's "cleaner" finding is accompanied by the *Dictionary of Occupational Titles* ("*DOT*") code for surveillance monitor.  *DOT* Code 379.367-010; http://www.occupationalinfo.org/37/379367010.html. (Last visited November 2, 2016).  The undersigned construes the final occupational finding of "cleaner" as a typographical error.

-13-

The ALJ discounted Dr. Qadir's consultative finding that Plaintiff's mental limitations were severe on the basis that it was not consistent with the other evidence (Tr. 40). The ALJ cited Dr. Boneff's finding that the February, 2011 IQ score of 71 was skewed by "lack of motivation, interest, and poor cooperation" and that Plaintiff "exaggerat[ed] his symptoms both cognitively and psychiatrically" (Tr. 41).

### III. STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less than a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of

whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*,
884 F.2d 241, 245 (6th Cir. 1989).


## IV.  FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any
substantial gainful activity by reason of any medically determinable physical or mental
impairment which can be expected to result in death or which has lasted or can be expected
to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In
evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence,
whether the claimant: 1) worked during the alleged period of disability; 2) has a severe
impairment; 3) has an impairment that meets or equals the requirements of an impairment
listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she
can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has
the burden of proof at steps one through four, but the burden shifts to the Commissioner at
step five  to demonstrate that, "notwithstanding the claimant's impairment, he retains the
residual functional capacity to perform specific jobs existing in the national economy."
*Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

-15-

## V.  ANALYSIS

Plaintiff makes two arguments for remand, first contending that the ALJ failed to address the allegations of "depression, limitations, and credibility." *Plaintiff's Brief,* 6, *Docket #10.*  He argues second that the ALJ ought to have accorded greater weight to the consultative findings of Drs. Qadir and Shah.  *Id.*  He argues, in effect, that the ALJ erred by failing to include his allegations of limitation and Drs. Qadir and Shah's findings in the hypothetical question posed to the VE.  *Id.* at 6-19.

### A.  Drs. Qadir and Shah's Findings[7]

Specifically, Plaintiff argues that the ALJ ought to have adopted Dr. Qadir's September, 2009 finding of "psychomotor retardation," depression, and that Plaintiff did not exaggerate his psychological symptoms (Tr. 445).  Likewise, he contends that the ALJ erred by declining to credit Dr. Shah's February, 2011 finding of a significant inability to "interact with the public, coworkers, and family members" and that Plaintiff was subject to psychological relapses due to his lack of mental health treatment (Tr. 484).  Plaintiff argues that the limitations of "simple, routine tasks" found in the hypothetical question to the VE does not adequately reflect his significant psychological limitations as found by the two consultative sources (Tr. 25-26).

---

[7]

Although Plaintiff presents the issue statement regarding the non-examining findings as his the second argument, *Plaintiff's Brief* at 6, the bulk of his brief addresses Drs. Qadir and Shah's findings.  As such, the Court addresses this argument first.

-16-

The ALJ found that Dr. Qadir's conclusions were "inconsistent with the remaining evidence," noting that the September, 2009 findings were completed within one year of the alleged onset of disability and that the consultative source did not have benefit of records showing that Plaintiff's psychological condition subsequently improved with treatment and medication (Tr. 40). The ALJ noted that Dr. Qadir did not find that Plaintiff was disabled but rather, that he "*might not* be able to perform simple work" (Tr. 40)(emphasis in original). The ALJ gave "no weight" to Dr. Qadir's opinion (Tr. 40).

The ALJ accorded "great weight" to Dr. Shah's opinion insofar as Dr. Shah found that Plaintiff experienced at GAF of 60 (moderate psychological symptoms) and the mostly normal clinical observations (Tr. 41). However, the ALJ rejected Dr. Shah's conclusion that Plaintiff experienced "severe functional impairment" related to his work abilities (Tr. 41). The ALJ determined that Dr. Shah's finding of "moderate to severe functional impairment" was "internally inconsistent" with the remainder of his findings (Tr. 41).

Plaintiff's argument that the ALJ erred by declining to give controlling weight to these sources is unavailing for multiple reasons. First, neither Dr. Qadir nor Dr. Shah is a treating source. As such, the ALJ did not err in declining to credit their opinions. *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994)(non-treating medical opinions entitled to "no special degree of deference"). Second, the ALJ's rejection of Dr. Qadir's opinion and the partial adoption of Dr. Shah's opinion is supported by the remainder of the transcript. The ALJ noted that Dr. Qadir's opinion stood at odds with Dr. Khademian's opinion from the following month

-17-

that Plaintiff had "good contact with reality, normal memory, hygiene, and concentration" and was capable of simple work activity (Tr. 40, 458).  The ALJ noted that Dr. Shah's finding of possibly disabling work-related psychological limitations was undermined by Dr. Boneff's finding from the same month that Plaintiff exaggerated his psychological and cognitive limitations (Tr. 40, 493).  Although Plaintiff cites the September 24, 2013 Appeals Council remand order stating that ALJ Blum failed to provide a rationale for the finding that Dr. Shah's findings were "internally inconsistent," the remand order did not require ALJ Christensen to adopt Dr. Shah's report (Tr. 145).  Notably, on September 18, 2015, the Appeals Council did not find error in ALJ Christensen's discussion or conclusions regarding Dr. Shah's findings (Tr. 2).

Finally, Plaintiff takes issue with Dr. Boneff's February, 2011 findings, asserting that "[t]here seems to be a pattern that when Dr. Boneff obtains low IQ studies he concludes that it is because the patient is not trying, cooperating and is exaggerating." *Plaintiff's Brief* at 15.  However, even assuming that Dr. Boneff's findings were invalidated by "bias," substantial evidence otherwise supports the finding that Plaintiff could perform a significant range of unskilled work.[8]  The ALJ cited subsequent treating records showing normal orientation,

---

[8]

A review of recent cases brought under 42 U.S.C. 405(g) in this district undermines Plaintiff's claim that Dr. Boneff's consultative findings in Social Security Disability cases were systematically tainted by bias against the claimant.  *See Johnson v. CSS,* 2015 WL 12670490 (September 18, 2015); *Bason v. CSS,* 2014 WL 1328168 (March 31, 2014); *Redlin v. CSS,* 2013 WL 1316956 (March 27, 2013); *Daniels v. Colvin,* 2016 WL 4543473 (August 1, 2016).

communication, perception, thought content, judgment, and impulse control (Tr. 42). Plaintiff displayed an appropriate mood and affect during group therapy and appropriate hygiene, grooming speech, and thought content at a subsequent individual session (Tr. 42). The ALJ noted that treating notations reflecting a greater degree of symptomology were based solely on Plaintiff's subjective complaints (Tr. 43).

### B.  Plaintiff's Allegations of Limitation

For overlapping reasons, the ALJ did not err in declining to credit Plaintiff's alleged degree of limitation.  The ALJ cited treating records showing that Plaintiff obtained an improvement in depressive symptoms with Zoloft (Tr. 40).  He noted that while Plaintiff claimed that the lack of insurance coverage prevented him from continuing to take psychotropic agents, treating records showed that Plaintiff expressed reluctance to take medicine for depression regardless of the insurance problems (Tr. 40).  The ALJ pointed out that while Plaintiff claimed that he required reminders to perform self-care tasks, the consultative examiners repeatedly noted that Plaintiff exhibited normal hygiene and grooming (Tr. 40). As such, the ALJ's partial rejection of Plaintiff's allegations should remain undisturbed.  While "subjective complaints of a claimant can support a claim for disability[] if there is also evidence of an underlying medical condition in the record," the ALJ may reject a claimant's professed degree of limitation, provided the conclusions are supported by substantial evidence. *Cruse v. Commissioner of Social Sec.*, 502 F.3d 532, 542 (6th Cir. 2007).

-19-

**C. The Hypothetical Question Adequately Reflected the Mental Limitations**

For the same reasons, Plaintiff's argument that the hypothetical question to the VE errantly excluded Drs. Qadir and Shah's findings and the subjective limitations is unavailing. The ALJ's rejection/partial adoption of the consultative findings and the rejection of the subjective limitations is well supported and explained. As such, the ALJ was not required to include discredited findings among the hypothetical limitations. *See Stanley v. Secretary of Health and Human Services*, 39 F.3d 115, 118–119 (6th Cir.1994)(ALJ not obliged to credit rejected claims in question to VE).

Contrary to Plaintiff's further argument, the hypothetical limitations of "simple," "routine," work with "occasional changes in the work setting and only brief and superficial contact with others" adequately conveyed Plaintiff's moderate limitations in social functioning and concentration, persistence, or pace ("CPP") (Tr. 25-26). Plaintiff relies on *Ealy v. Commissioner of Social Sec.,* 594 F.3d 504, 516 (6th Cir. 2010) which holds that the failure to account for a claimant's full degree of mental impairment in the hypothetical question reversible error. However, *Ealy* does not hold that the terms "simple, repetitive," "routine" or similar modifiers are intrinsically inadequate to address moderate deficiencies in concentration, persistence, or pace. Rather, the *Eal*y Court determined that the hypothetical limitations of "simple, repetitive" (drawn from a non-examining medical source conclusion) impermissibly truncated the same source's conclusion that the claimant should be limited to "simple repetitive tasks to '[two-hour] segments over an eight-hour day where

-20-

speed was not critical'." *Id*., 594 F.3d at 516. The position that "simple and repetitive" or synonymous terms are always insufficient to address moderate concentrational deficiencies reflects an erroneous reading of *Ealy*.

Likewise, while Plaintiff cites *Brown v. Commissioner,* 2009 WL 596360, *8-9 (March 9, 2009), where the court found that the hypothetical modifiers of "simple and routine" did not reflect moderate limitations in CPP, a number of recent cases from this district and elsewhere have found that such descriptives sufficiently reflect moderate limitation in CPP. *Smith–Johnson v. Commissioner of Social Sec.*, 579 Fed. App'x. 426, 437, 2014 WL 4400999, *10 (6th Cir. September 8, 2014)(moderate concentrational limitations in carrying out detailed instructions and maintain attention and concentration for extended periods adequately addressed by restricting the claimant to unskilled, routine, repetitive work); *Despain v. Commissioner of Social Sec.,* 2014 WL 6686770, *12 (E.D.Mich. November 26, 2014)(same); *Lewicki v. Commissioner of Social Sec.,* 2010 WL 3905375, *2 (E.D.Mich. Sept.30, 2010)(the modifiers of "simple routine work" adequately accounted for the claimant's moderate concentrational deficiencies).

The Court is mindful that Plaintiff has faced a slog of hearings and administrative remands before filing the present action.  Accordingly, the recommendation to uphold the Commissioner's decision should not be read to trivialize either these delays or Plaintiff's limitations. Nonetheless, ALJ Christensen's  determination that Plaintiff was capable of a significant range of unskilled  work is well within the "zone of choice" accorded to the fact-

finder at the administrative hearing level and should not be disturbed by this Court. *Mullen v. Bowen*, *supra*.

## <u>CONCLUSION</u>

For the reasons stated above, I recommend that Defendant's motion for summary judgment [Dock. #16] be GRANTED and that Plaintiff's motion for summary judgment [Dock. #10] be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); and *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Any objections must be labeled as "Objection #1," "Objection #2," etc.; any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity. The response must

-22-

specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," *etc.*

s/R. Steven Whalen
R. STEVEN WHALEN
United States Magistrate Judge

Dated: January 17, 2017

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing document was sent to parties of record on January 17, 2017, electronically and/or by U.S. mail.

s/Carolyn M. Ciesla
Case Manager